**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MTE HOLDINGS LLC, et al., | : | Case No. 19-12269 (CTG) |
| Debtors. | : | (Jointly Administered) |
| CHENAULT-VAUGHAN FAMILY PARTNERSHIP, LTD. | : | |
| Plaintiff-Appellant, | : | Adversary No. 20-51005 (CTG) |
| v. | : | |
| MDC REEVES ENERGY, LLC, a Delaware, Limited Liability Company, CENTENNIAL RESOURCE DEVELOPMENT, INC., a Delaware Corporation, and CENTENNIAL RESOURCE PRODUCTION, LLC, a Delaware Limited Liability Company, | : | Case No. 21-1846-SRF |
| Defendants-Appellees. | : | |

**MEMORANDUM OPINION[1]**

Presently before the Court is Chenault-Vaughan Family Partnership, Ltd.'s ("Chenault-Vaughan") appeal from the Bankruptcy Court's Memorandum Opinions issued on December 17, 2021, (Adv. D.I. 97) ("*Mem. Op.*"), and February 14, 2022, (Adv. D.I. 120),[2] entered in the above-captioned adversary proceeding ("Adversary Proceeding"), which denied Chenault-

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment, and the case was assigned to the undersigned on April 8, 2022. (D.I. 15)

[2] The docket of the adversary proceeding, captioned *Chenault-Vaughan Family P'ship, Ltd. v. MDC Reeves Energy, LLC, et al.*, Adv. No. 20-51005 (CTG), is cited herein as "Adv. D.I. __."

Vaughan's summary judgment motion and granted Centennial Resources Operating, LLC's[3] ("Centennial") cross-motion for summary judgment.[4] (D.I. 1; D.I. 8) For the reasons set forth below, the Court AFFIRMS the Bankruptcy Court's decision in its entirety.

## I. BACKGROUND

Chenault-Vaughan was one-sixth owner of the mineral estate in certain property at issue. (D.I. 19-13 at A3924–28, ¶ 22) On February 14, 2014, Chenault-Vaughan leased its interest in the mineral estate to 84 Exploration Partners, LLC ("84 Exploration") in exchange for a one-fourth royalty on the produced oil and gas ("Lease"). (*Id.* at A3930–32) As the Bankruptcy Court explained, although the document at issue is described as a "lease," the Texas Supreme Court has explained that this type of agreement "is not a 'lease' in the traditional sense." *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). Rather, "the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Id.* The rights that such a lease grants to the lessee/grantee are commonly described as a "working interest" in the grantor/lessor's mineral estate. A working interest is the right to operate under an oil and gas lease and gives the owner the right to exploit the minerals on the land. 8 Patrick H. Martin and Bruce M. Kramer, WILLIAMS & MEYERS, OIL AND GAS LAW, MANUAL OF OIL AND GAS TERMS 1156–57 (2020). A working interest is subject to all costs of exploration and development. *Id.* Mineral leases, like the Lease here, typically require the lessee to pay a

[3] On February 2, 2023, Appellees advised of company name changes: Centennial Resource Production, LLC is now known as Permian Resources Operating, LLC, and its parent holding company Centennial Resource Development Inc. is now known as Permian Resources Corporation. (D.I. 26) For consistency of the record and in the briefing, the Court will refer to the parties under their previous names.

[4] The briefing for the appeal is as follows: Chenault-Vaughan's opening brief (D.I. 18); Centennial's response (D.I. 22); and Chenault-Vaughan's reply (D.I. 24).

royalty. Because the lessor of the oil and gas lease "reserves" the right to be paid a royalty, oil and gas law often describes the lessor as retaining a "royalty interest" in the mineral estate.

As is also common, the Lease permitted 84 Exploration to assign its working interest. (D.I. 19-13 at A3930–31, ¶¶ 3, 7) Through subsequent assignments, MDC Reeves Energy ("MDC"), a debtor in the above-captioned chapter 11 cases, acquired roughly 80% of the working interest in the Lease, and Luxe Operating ("Luxe"), held the remaining 20% of the working interest. (D.I. 19-13, Exs. 3–7, 9, 11) Though Centennial owned a small working interest in the Lease in the past, it conveyed its interest to Luxe on January 1, 2018. (D.I. 19-10 at A3259, ¶ 4) At all times relevant to this appeal, Centennial owned no interest in the Lease but served as Operator of both Unit A and B (as described below) under the terms of the applicable joint operating agreements. (*Id.* at ¶ 5)[5]

The Lease permitted pooling, which is when mineral interests of different tracts are joined together for the purposes of drilling. (D.I. 19-13 at A3930, ¶ 5) The land covered by the Lease was pooled into two different sections: Iron Eagle Unit A ("Unit A"), covering the eastern portion, and Iron Eagle Unit B ("Unit B"), covering the western portion. (D.I. 19-10, Ex. 16 at A3259, ¶ 7)[6]

In December of 2017, Centennial signed a joint operating agreement ("Unit A JOA") with both MDC and Luxe, pursuant to which Centennial was designated as the Operator of

---

[5] Centennial has since obtained MDC's interest under Unit A in satisfaction of its claims against MDC's bankruptcy estate. (D.I. 22 at 6; D.I. 19-15 at A5004, ¶ 35)

[6] Centennial filed a Declaration and Notice of Pooled Unit for both Unit A ("Unit A Declaration") and Unit B ("Unit B Declaration"). (D.I. 19-10, Ex. 16 at A3259, ¶¶ 7–8) Centennial originally filed the Unit A Declaration on November 30, 2017 (D.I. 19-10, Ex. 6), but misidentified the survey associated with the lands. A corrected version of the Unit A Declaration was filed on January 7, 2021 (D.I. 19-10, Ex. 8). The same mistake occurred regarding the Unit B Declaration, which was originally filed on January 18, 2019 (D.I. 19-10, Ex. 7). A corrected version of the Unit B Declaration was filed on July 25, 2019 (D.I. 19-10, Ex. 9).

MDC's and Luxe's respective shares of the Lease, along with other oil and gas leases committed to Unit A. (D.I. 19-10, Ex. 16 at A3259, ¶ 9; D.I. 19-10, Ex. 10 Unit A JOA signatures at A3118–20) According to the Unit A JOA, Centennial would pay the expenses for development, which included the royalties that MDC and Luxe owed to Chenault-Vaughan, and Centennial would charge each party its proportionate share of those expenses. (D.I. 19-10, Ex. 16 at A3259, ¶ 9; D.I. 19-10, Ex. 16 at A3100) In January of 2019, Centennial entered into a similar joint operating agreement covering Unit B ("Unit B JOA"), but only Luxe signed the Unit B JOA—MDC did not. (D.I. 19-10, Ex. 16 at A3260, ¶ 10; D.I. 19-10, Ex. 11 Unit B JOA signatures at A3182) Like the Unit A JOA, the Unit B JOA required Centennial to pay development expenses (and charge a proportional share) to Luxe, and Centennial accordingly has included Luxe's royalty obligations to Chenault-Vaughan among the expenses it has paid with respect to Unit B. Because MDC never became a party to the Unit B JOA, Centennial was not obligated to pay MDC's royalty obligations to Chenault-Vaughan with respect to the Unit B portion of the Lease.

MDC filed for bankruptcy on November 8, 2019. (*In re MDC Texas Operator, LLC*, No. 19-bk-12387-CTG, D.I. 1) On November 19, 2019, Centennial rescinded the outstanding, unsigned Unit B JOA from MDC. (D.I. 19-13, Ex. 17 at A4134)

In the period after Luxe entered into the Unit B JOA with Centennial, Centennial proceeded on a mistaken assumption that MDC had become a party to the Unit B JOA, as it had with respect to the Unit A JOA. Accordingly, Centennial paid royalties to Chenault-Vaughan for both Unit A and Unit B based on MDC's share of the production under the Lease. The total amount of those overpaid royalties, based on unrebutted evidence, was $137,276.73. When Centennial discovered the error in February of 2020, Centennial began setting off its overpayment from the royalties it otherwise owed to Chenault-Vaughan on Unit A. Those

overpayments were fully recouped in February of 2021. (D.I. 19-10, Ex. 16 at A3260, ¶¶ 10–12) Accordingly, in March of 2021, Centennial resumed paying Chenault-Vaughan for royalties owed on Unit A. (*Id.* at ¶ 13)

On November 11, 2020, Chenault-Vaughan filed a complaint initiating the Adversary Proceeding against MDC, Centennial, and Centennial's parent company, and seeking recovery of royalties for Units A and B. (Adv. D.I. 1) On December 22, 2020, Chenault-Vaughan filed an amended complaint asserting claims under Texas law for trespass to try title (Count I), relief under the Texas Natural Resource Code ("TNRC") § 91 (Count II), declaratory relief under the state statute Tex. Civ. Prac. & Rem. § 37.001 *et seq.* (Count III), declaratory relief under the federal statute 28 U.S.C. § 2201 *et seq.* (Count IV), conversion (Count V), and reformation (Count VI). (Adv. D.I. 16 at 13–25) All claims are based on the alleged underpayment or failure to pay royalties on Unit B and recoupment of overpaid Unit B royalties from Unit A. (*See id.* at 3–13) The amended complaint specifically alleges that MDC is liable for the royalties if Centennial prevails on its position. (*Id.* at 11, ¶ 56)

During the course of the chapter 11 cases, the Bankruptcy Court granted MDC's motion to abandon the Lease by an Order entered on January 25, 2021. (D.I. 19-4 at A1663–64) After the Bankruptcy Court allowed MDC to abandon its portion of the Lease covering Unit B, MDC's interest in the minerals reverted to Chenault-Vaughan. As such, Chenault-Vaughan became an unleased mineral cotenant in Unit B. (D.I. 19-10 at A3260–61, ¶ 14). Centennial does not claim ownership of Chenault-Vaughan's mineral interest. (*Id.*) When the parties to the Unit B JOA recover the costs of development and production for Unit B, Centennial will pay Chenault-Vaughan the value of its share of production as a cotenant. (*Id.*; D.I. 22 at 12)

Following discovery, both Chenault-Vaughan and Centennial moved for summary judgment. (Adv. D.I. 55; Adv. D.I. 64)  The Bankruptcy Court held a hearing on the motions on September 8, 2021. (Adv. D.I. 93; Adv. D.I. 95 Hearing Transcript)  The Bankruptcy Court issued a Memorandum Opinion on December 17, 2021, granting summary judgment in favor of Centennial on Chenault-Vaughan's claims for trespass to try title, royalties under TNRC § 91, declaratory judgment, conversion, and reformation. *Mem. Op.* at 39–40.  Specifically, the Bankruptcy Court held that before MDC abandoned the Lease, Chenault-Vaughan's contractual right to royalties on Unit B ran against MDC, not Centennial. *See id.* at 30.  Therefore, based on its mistaken belief that MDC had signed the Unit B JOA, Centennial was entitled to deduct the overpayments it had made on Unit B production from royalties owed on Unit A until the overpayment was recouped. *See id.* at 34–36.  The Bankruptcy Court also entered summary judgment in favor of Centennial's parent company because Chenault-Vaughan failed to provide any evidence of its involvement in the relevant transactions. *Id.* at 38–39.  Chenault-Vaughan filed a notice of appeal on December 29, 2021.  (D.I. 1)

The Bankruptcy Court's December 17, 2021, Memorandum Opinion left two issues unresolved.  With respect to the first issue—whether there were any wells in Unit B for which the value of the production exceeded costs during the period after MDC's abandonment—the Bankruptcy Court issued a second Memorandum Opinion on January 11, 2022, based on the parties' agreement that no Unit B wells had reached payout, and thus, Chenault-Vaughan was not owed any royalties. (Adv. D.I. 113 at 1–2)  With respect to the second issue—how to address the claims against MDC, which were not the subject of Chenault-Vaughan's motion for summary judgment—the Bankruptcy Court entered judgment in favor of MDC on February 14, 2022,

based on Chenault-Vaughan's position that it "made the intentional decision not to file a proof of claim" and "does not seek to recover" against MDC's bankruptcy estate. (Adv. D.I. 120 at 4)

On February 28, 2022, Chenault-Vaughan filed an amended notice of appeal with this Court. (D.I. 8) Chenault-Vaughan appeals the Bankruptcy Court's decision with respect to its trespass to try title claim (Count I), claims for royalties under TRNC § 91 (Count II), and judgment in favor of MDC. Chenault-Vaughn does not contest the Bankruptcy Court's decision with regards to its claims for declaratory relief under both state and federal law (Counts III & IV), conversion (Count V), reformation (Count VI), or its claims against Centennial's parent company. The parties consented to the jurisdiction of the undersigned Magistrate Judge on April 8, 2022. (D.I. 15)

## II. JURISDICTION

While the parties contend there is jurisdiction, the court has an obligation to ensure proper jurisdiction. *In re Truong*, 513 F.3d 91, 93 (3d Cir. 2008). Under 28 U.S.C. § 158(a)(1), the district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court. The court recognizes there is a disagreement among the circuits regarding whether a Magistrate Judge has proper authority under 28 U.S.C. § 636(c) to issue final judgments in bankruptcy appeals. The Fifth and Seventh Circuits hold it is improper for a Magistrate Judge to issue a final judgment even if the parties' consented to the Magistrate Judge's jurisdiction. *See In re Elcona Homes Corp.*, 810 F.2d 136 (7th Cir. 1987); *Minerex Erdoel, Inc. v. Sina, Inc.*, 838 F.2d 781 (5th Cir. 1988); *see also S. Cent. Houston Action Council v. Oak Baptist Church (In re S. Cent. Houston Action Council)*, 38 F.4th 471, 472 (5th Cir. 2022). However, these cases are not binding on this Court.

The Third Circuit has not spoken on a Magistrate Judge's authority under 28 U.S.C. § 636(c) to enter final judgments in bankruptcy appeals post-Congress's enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). The Third Circuit previously held that a Magistrate Judge did not have jurisdiction because the governing Bankruptcy Reform Act of 1978 expressly prohibited district courts from referring bankruptcy appeals to Magistrate Judges. *See In re Morrissey*, 717 F.2d 100, 102–03 (3d Cir. 1983). However, *In re Morrissey* was decided pre-BAFJA, so its applicability post-BAFJA is questionable. It remains uncertain whether the Third Circuit will follow suit with the Fifth and Seventh Circuits in holding that a Magistrate Judge does not have authority to issue final judgments in bankruptcy appeals.

There is a District of Delaware case which opined that a "referral to the Magistrate Judge for an advisory report and recommendation pursuant to [§] 636(b) is not improper under the BAFJA bankruptcy system." *In re Continental Airlines, Inc.*, 218 B.R. 324, 327–28 (D. Del. 1997), *aff'd*, 134 F.3d 536 (3d Cir. 1998). The court further noted that "[b]ecause the referral to the Magistrate Judge in this case was made pursuant to [§] 636(b), this Court offers no opinion on the propriety of referring bankruptcy appeals to a magistrate judge for *final decision pursuant to [§] 636(c)(1)*." *Id.* at 328 n.2 (emphasis added).

Here, the parties consented to the jurisdiction of a Magistrate Judge on April 6, 2022. (D.I. 14) On April 8, 2022, the Honorable Maryellen Noreika ordered the referral to the undersigned Magistrate Judge "to conduct all proceedings and the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73." (D.I. 15) Based on the foregoing analysis, the Court finds no binding authority to preclude issuing this decision as a final judgment pursuant to 28 U.S.C. § 636(c). However, in the event that the Third Circuit

determines that a Magistrate Judge lacks authority to issue a final judgment on a bankruptcy appeal, even where the parties consented, then this Memorandum Opinion contains sufficient detail so that it can be treated, alternatively, as a Report and Recommendation pursuant to 28 U.S.C. § 636(b).

## III.   STANDARD OF REVIEW

On appeal, "we review the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *Interface Group-Nevada v. TWA (In re TWA)*, 145 F.3d 124, 131 (3d Cir. 1998); *see also In re Energy Future Holdings Corp.*, 558 B.R. 684, 686 (D. Del. 2016).  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. Velazquez*, 749 F.3d 161, 176 (3d Cir. 2014) (quoting *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).  "Abuse of discretion is found where a 'court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" *In re Energy Future Holdings Corp.*, 558 B.R. at 686 (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987)).

Under Federal Rule of Civil Procedure 56, made applicable to this Adversary Proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056, the Bankruptcy Court must grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of

law. *See id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* Moreover, a non-moving party must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985), *cert. denied*, 474 U.S. 1010 (1985) (citation omitted). The same standard applies when issues are presented in the context of cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

## IV. DISCUSSION

On appeal, Chenault-Vaughan raises seven issues for review. (D.I. 18 at 2–3) The Court finds these questions can be categorized as follows: (1) Chenault-Vaughan's claim under trespass to try title; (2) Chenault-Vaughan's claims regarding Unit B royalties under TNRC § 91 as well as under contract theories; (3) Chenault-Vaughan's claims regarding Unit A royalties under the doctrines of recoupment and voluntary payment; (4) Chenault-Vaughan's claim for a full accounting of Unit A; and (5) Chenault-Vaughan's request to reverse the ruling against MDC. The Court will address each of these below.

### A. <u>Trespass to try title claim</u>

"A trespass to try title action is the method of determining title to lands, tenements, or other real property." Tex. Prop. Code § 22.001(a) Chenault-Vaughan argued below that, as "lessor," it owns (and has owned) the "royalty interest" associated with its one-sixth mineral interest and is therefore the owner of whatever share of production is derived from its royalty interest. (*See* Adv. D.I. 68 at 6–12) As the Bankruptcy Court noted:

> The dispute here, however, is not over whether Chenault-Vaughan holds the "royalty interest" in the lands at issue. No one disputes that it does. Indeed, since MDC abandoned its interest in the lease, that working interest was also returned to Chenault-Vaughan upon the effective date of the abandonment. The critical question on which the parties disagree . . . is about the legal consequences that flow from Chenault-Vaughan holding a royalty interest in the mineral estate.

*Mem. Op.* at 23–24. The Bankruptcy Court noted that Texas law "has answered that question." *Id.* at 24. "The lessor's 'royalty interest' is not a possessory interest and it therefore is not a proper subject of a trespass to try title action." *Id.* (citing *Richmond v. Wells*, 395 S.W.3d 262, 267 (Tex. App. 2012)). The Bankruptcy Court accordingly granted summary judgment in favor of Centennial on Chenault-Vaughan's trespass to try title claim. *Mem. Op.* at 24.

Chenault-Vaughan argues the Bankruptcy Court erred in concluding that Chenault-Vaughan did not have a possessory interest because Chenault-Vaughan owns a mineral interest in the property, which is possessory. (D.I. 18 at 64) Specifically, Chenault-Vaughan argues that it always retained the executive right to lease, which is a possessory right. (*Id.* at 55, 65) Conversely, Centennial argues that Chenault-Vaughan used its executive right to give its development right away, so it only retained non-possessory rights, and thus, is unable to bring a trespass to try title claim. (D.I. 22 at 53–54)

The caselaw is clear: a royalty interest is non-possessory. *See Ridge Nat. Res., L.L.C. v. Double Eagle Royalty L.P.*, 564 S.W.3d 105, 113 (Tex. App. 2018); *Richmond*, 395 S.W.3d at 267; *Pool*, 124 S.W.3d at 192. However, the Court finds Chenault-Vaughan did retain a possessory interest via its executive interest. Under Centennial's reasoning, it assumes there is only one time a lessor can exercise the executive right to lease, which is incorrect since Chenault-Vaughan could have entered into a "top lease." (D.I. 24 at 20) *See Headington Royalty, Inc. v. Finley Res., Inc.*, 623 S.W.3d 480, 485 n.3 (Tex. App. 2021) ("A top lease is a lease granted by a mineral owner during the existence of another lease that will become effective if and when the existing lease expires or terminates."); *see also TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018). Therefore, the Court finds Chenault-

Vaughan at all times retained a possessory interest, not stemming from its royalty interest, but from its executive interest.

Nevertheless, the Bankruptcy Court's decision to deny summary judgment on the trespass to try title claim is correct because Chenault-Vaughan did not satisfy all the elements necessary.[7] Trespass to try title is alleged with elements defined by Texas Rule of Civil Procedure 783. The petition must state:

> (a) The real names of the plaintiff and defendant and their residences, if known.
>
> (b) A description of the premises by metes and bounds, or with sufficient certainty to identify the same, so that from such description possession thereof may be delivered, and state the county or counties in which the same are situated.
>
> (c) The interest which the plaintiff claims in the premises, whether it be a fee simple or other estate; and, if he claims an undivided interest, the petition shall state the same and the amount thereof.
>
> (d) That the plaintiff was in possession of the premises or entitled to such possession.
>
> (e) That the defendant afterward unlawfully entered upon and dispossessed him of such premises, stating the date, and withholds from him the possession thereof.
>
> (f) If rents and profits or damages are claimed, such facts as show the plaintiff to be entitled thereto and the amount thereof.
>
> (g) It shall conclude with a prayer for the relief sought.

Tex. R. Civ. P. 783. The Bankruptcy Court found the element relating to Centennial's unlawful entry and dispossession was not met.

> [E]ven after MDC abandoned its working interest such that Chenault-Vaughan obtained a possessory interest, that abandonment did not disturb Luxe's 20 percent working interest. As a result, Chenault-Vaughan became a co-tenant with Luxe, each with the right to possess the land and extract its minerals. Because Luxe was entitled to possess the land,

[7] Chenault-Vaughan's Amended Complaint alleged a trespass to try title claim under Texas Property Code 22.001 *et seq.* and Texas Rule of Civil Procedure 783 *et seq.* (Adv. D.I. 16 at 13, ¶ 2)

> and also to permit Centennial, as its operator, to do so on its behalf, there is no basis under Texas law for Chenault-Vaughan to eject Centennial from the land.

*Mem. Op.* at 24; *see* Tex. R. Civ. P. 783(e); *see also Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. Civ. App. 1954) ("Each co-tenant may enter upon the premises for the purpose of exploring for oil and gas and may drill and develop the premises.").

On appeal, Chenault-Vaughan does not address the Bankruptcy Court's conclusion that this element was unsatisfied. Chenault-Vaughan simply argues that "[t]he only issue is whether Chenault holds a possessory interest in property. If yes, *then Chenault is entitled* to summary judgment on its trespass to try title claim." (D.I. 18 at 61 (emphasis added))

Chenault-Vaughan provides no support for its argument that it is automatically entitled to summary judgment if it has a possessory interest. To the extent Chenault-Vaughan relies on its briefing before the Bankruptcy Court to support this claim, that argument is unpersuasive. There, Chenault-Vaughan argued that it sufficiently pled a trespass to try title claim because Centennial "has dispossessed Chenault of the disputed portion of the decimal royalty interest." (Adv. D.I. 83 at 2) However, Chenault-Vaughan cites no caselaw applying a trespass to try title claim to anything other than ejection from the physical premises. To the extent Chenault-Vaughan argues for application of the statute based on missed royalty payments—as opposed to ejection from the land—Chenault-Vaughan has not met the elements of a trespass to try title claim. As Chenault-Vaughan failed to allege the elements required for a trespass to try title claim, the Court finds no error in the Bankruptcy Court granting of summary judgment in favor of Centennial as a matter of law.

### B. <u>Unit B Royalties Under TNRC § 91 and Theories of Contract</u>

Chenault-Vaughan argues there is a statutory right to payment because Centennial is a "payor" as defined by the applicable statute TNRC § 91 requiring prompt payment of royalties.

(D.I. 18 at 30–31) In the alternative, Chenault-Vaughan argues there may be a contractual right to payment whereby Centennial effectively made itself a payor. (*Id.* at 40) Both arguments are discussed below.

**1. Statutory right to payment**

Section 91.402 of the Texas Natural Resources Code provides that, after the first sale of production from an oil and gas well, payments must be made from a "payor" to a "payee" on "a timely basis according to the frequency of payment specified in a lease or other written agreement between payee and payor." Tex. Nat. Res. Code § 91.402(a). The statute defines "payor" as "the party who undertakes to distribute oil and gas proceeds to the payee, whether as the purchaser of the production of oil or gas generating such proceeds or as operator of the well from which such production was obtained or as lessee under the lease on which royalty is due." Tex. Nat. Res. Code § 91.401(2). The statute defines "payee" as "any person or persons legally entitled to payment from the proceeds derived from the sale of oil or gas from an oil or gas well located in this state." Tex. Nat. Res. Code § 91.401(1).

Chenault-Vaughan argues that an operator is a "payor" under the statute, thus Centennial is obligated to pay royalties as Operator of the pooled units. (D.I. 18 at 31) Centennial argues it does not meet the statutory definition of "payor" because it did not "undertake" the payment obligation for Unit B. (D.I. 22 at 23–24) Centennial argues the Lease is with MDC, so MDC is the party obligated to Chenault-Vaughan for the Unit B royalties. (*Id.* at 25) Chenault-Vaughan responds that Centennial "undertook" to distribute and thus is a "payor" because 1) it filed a Declaration and Notice of Pooled Unit B; 2) it entered into a division order contract and paid royalties; and 3) it ratified the Declaration and Notice of Pooled Unit B. (D.I. 24 at 15–16)

"A 'royalty interest' is the right to receive, either in kind or its equivalent in money, a stipulated fraction of the oil and gas produced and saved, free of all costs of development and production, when and if there is production." 55A Tex. Jur. 3d Oil and Gas § 341. There are two types of royalty interests: nonparticipating and overriding. 55A Tex. Jur. 3d Oil and Gas §§ 346–47. "Overriding royalty interests and lease royalty interests are creatures of the oil and gas lease," whereas a nonparticipating royalty interest "does not relate to a particular lease … [and] does not end when the lease ends, rather it is generally tied to the land." *Devon Energy Prod. Co., L.P. v. Apache Corp*, 550 S.W.3d 259, 264 (Tex. Ct. App. 2018) ("*Devon Energy*").

There are two leading cases that deal with whether an operator was obligated to pay royalties to a royalty interest holder in the absence of a valid lease between them. In *Prize Energy*, the Court of Appeals of Texas held that, in certain limited circumstances, the act of operating an oil well can impose obligations under Section 91 to pay a nonparticipating royalty interest holder. *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 561–62 (Tex. Ct. App. 2011) ("*Prize Energy*"). *Devon Energy* held that an operator was not obligated to pay an overriding royalty interest holder. *Devon Energy,* 550 S.W.3d at 263–64. The court in *Devon Energy* clarified that, under the TNRC, an operator is not obligated to a payee simply by being an operator (as *Prize Energy* seems to imply), but rather the result turns on the type of royalty interest. "[B]ecause the royalty interest in *Prize Energy* was a[] [nonparticipating royalty interest] and not a royalty interest reserved by a lease, that distinguishes *Prize Energy* from this case." *Id.* at 264. Thus, depending on whether the royalty interest is a nonparticipating royalty interest or an overriding royalty interest, an operator may have an obligation to pay the royalty interest owner, even if there is no lease between them.

Chenault-Vaughan's royalty interest is an overriding royalty interest, which derives entirely from the Lease and is not tied to the land. *See Mem. Op*. at 29. It is undisputed that Chenault-Vaughan has an undivided 1/6 mineral interest in the property. (D.I. 19-13 at A3924–28, ¶ 22) Chenault-Vaughan executed the Lease with 84 Exploration giving them a working interest in the land "for the purpose of exploring for, developing, producing and marketing oil and gas." (*Id.* at A3930) The Lease gave Chenault-Vaughan a 25% royalty interest. (*Id.*) Both statute and caselaw indicate Chenault-Vaughan's royalty interest is an overriding royalty interest. *See* 55A Tex. Jur. 3d Oil and Gas § 347 ("An 'overriding royalty interest' is a fraction of gross production that does not affect mineral owners because it is *carved out of the working interest under an oil and gas lease*") (emphasis added); *Devon Energy*, 550 S.W.3d 259.

Chenault-Vaughan argues that the Bankruptcy Court failed to distinguish *Devon Energy* because, here, Centennial is operating from the Lease whereas "[t]he operator in *Devon* was not operating the lease under which the plaintiff claimed." (D.I. 24 at 12; *see also* D.I. 18 at 56) The Bankruptcy Court adequately addressed Chenault-Vaughan's single-lease argument and found it is a distinction "that makes no difference." *Mem. Op*. at 30. As the Bankruptcy Court stated, "[w]hile Luxe's interest in the [Lease], like MDC's, derives ultimately from Chenault-Vaughan, the fact that Centennial was Luxe's operator on Unit B, rather than MDC's, makes this situation highly analogous to the 'two-lease' cases that Chenault-Vaughan seeks to distinguish." *Id.*

Chenault-Vaughan further argues against application of *Devon Energy* because "[t]he theory advanced in *Devon Energy*, that only the nonparticipating royalty owner was eligible for payment from the operator, omits consideration of the first *Prize Energy* damages discussion." (D.I. 24 at 15) In *Prize Energy*, BP's 25% mineral interest allegedly reverted back to BP

because the joint operating agreement terminated. 345 S.W.3d at 547. Thereafter, BP deeded its mineral interest to Cliff Hoskins but reserved a 6.25% nonparticipating royalty interest. *Id.* Essentially, Chenault-Vaughan questions why Hoskins was awarded money damages when he did not have the determining nonparticipating royalty interest that BP did. However, this argument is inapplicable because Hoskins was awarded money damages for unpaid net revenues, not from a royalty interest. *See Prize Energy*, 345 S.W.3d at 558–60.

**2. Contractual right to payment by cross-conveyance**

Chenault-Vaughan argues that, in ruling that Centennial is not contractually obligated to pay royalties, the Bankruptcy Court failed to consider cross-conveyances of other "contracts" like the Declaration. (*See* D.I. 18 at 31–32) Specifically, Chenault-Vaughan argues that the Bankruptcy Court's ruling "omits the property ownership derived through cross-conveyances which took place when Unit B was formed." (*Id.* at 31) Chenault-Vaughan argues specifically that Centennial is liable under the theories of estoppel by deed and ratification, which are discussed below.

i. Estoppel by deed

Under Texas law, "estoppel by deed stands for the proposition that all parties to a deed are bound by the recitals in it, which operate as an estoppel." *Teal Trading and Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 336 (Tex. 2020) (citation omitted). Chenault-Vaughan argued below that Centennial was liable for the royalties on an "estoppel" or "ratification" theory based on recitals in the Unit B Declaration. (*See* Adv. D.I. 68 at 19–26) As the Bankruptcy Court explained, "When multiple leases are pooled together into a common unit, Texas law requires the filing of a declaration setting out the tract of land at issue." *Mem. Op.* at 33 (citing 1 Texas Law of Oil and Gas § 4.8; *Dixon v. Amoco Prod., Co.*, 150

S.W.3d 191, 194 (Tex. App 2004)). Chenault-Vaughan argued that the Declaration Centennial filed with respect to Unit B contained a recital stating that Unit B "encompasses the entire Leasehold interest" and that, as a result, Centennial is "estopped to deny the terms of the Lease, including the royalty provisions." (Adv. D.I. 68 at 20) Chenault-Vaughan raises the same argument on appeal. (*See* D.I. 18 at 47–48)

The Court rejects this argument for the same reasons set forth by the Bankruptcy Court. "The recording of a deed to which one is not a party does not by itself make that entity a party to the deed." *Mem. Op.* at 33 (citing *Trial v. Dragon,* 593 S.W.3d 313, 320 (Tex. 2019)). More importantly, "[t]he Unit B declaration is not a deed, and nothing therein can be understood to be a representation by Centennial that it would undertake to pay the royalties due under the [Lease]." *Id.* at 33–34.

On appeal, Chenault-Vaughan argues that the Declaration was a deed or that it served the purposes of a deed, and cites *Kelln v. Brownlee*, 517 S.W.2d 568 (Tex. App. 1975), in support of this assertion.[8] (D.I. 18 at 45–48) According to Chenault-Vaughan, this case "shows the efficacy of pooling as it affects title to royalty owner property." (*Id.* at 47) While it may be helpful for that reason, the case provides no guidance here. The issue in *Kelln* was the amount of a royalty—whether the amount was based on the actual acreage owned under the lease or based on the entire land via pooling. *Kelln,* 517 S.W.2d at 571–72. Here, the amount of royalty is not the issue. The issue is whether a royalty is owed at all. This was not an issue in *Kelln* because

[8] Chenault-Vaughan also cites to *Teal Trading and Dev., LP*, 593 S.W.3d at 355, for support. (D.I. 18 at 42) But as Centennial points out, that case dealt with a plat filed in the deed records which on its own has legal significance. (D.I. 22 at 37) Therefore, the Court does not find it applicable to this situation and need not address it further. *See also Dragon*, 593 S.W.3d at 320 (finding estoppel by deed inapplicable to the facts of the case because the party's mineral interest derived "from a source separate and apart from the [deed]").

the operator Cabot was in privity of contract with the lessor/grantor Kelln and sent the division orders for approval to Kelln before sending the royalties to Brownlee, the grantee. *See id.* at 570. Therefore, the Court is not persuaded by this case and finds the Bankruptcy Court properly rejected Chenault-Vaughan's estoppel by deed argument.

ii. Ratification

Chenault-Vaughan further argues that Centennial is contractually liable under the theory of ratification. Chenault-Vaughan claims the Bankruptcy Court did not address the issue of ratification as it "conflated" the issue with that of estoppel by deed. (D.I. 18 at 47–48) According to Chenault-Vaughan, Centennial ratified the Lease, and the royalty obligation therein, by including it in the Unit B Declaration and by sending royalty payments and division orders to Chenault-Vaughan. (*Id.* at 49–54).

First, the Bankruptcy Court did address ratification. *Mem. Op.* at 32–34; *see also Mem. Op.* at 30 n.91. Chenault-Vaughan's estoppel by deed and ratification arguments are both rooted in its assertion that the Lease, and the royalty payment obligation therein, was incorporated by reference via the Unit B Declaration. Chenault-Vaughan's ratification argument is no more persuasive.

"Ratification is the adoption or confirmation by a person *with knowledge of all material facts* of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) (emphasis added). *See also Smith v. Estill,* 87 Tex. 264, 271 (1984) ("To constitute ratification, it must appear that the acts relied upon were done with a full knowledge of all the facts, and with intent to adopt the unauthorized act in question."); *Texas Petroleum Land Mgmt., LLC v. McMillan*, 641 S.W.3d

831, 844–45 (Tex. App.—Eastland 2022) (same). When facts are uncontroverted, as here, a court may decide a ratification issue as a matter of law. *BPX Operating,* 629 S.W.3d at 196.

The undisputed facts establish that the Lease was listed in the Unit B Declaration by virtue of Luxe's participation in the Unit. Centennial's initial payment of royalties to Chenault-Vaughan derived from both Luxe's and MDC's working interest in Unit B and was based on its mistaken understanding that MDC signed the Unit B JOA. Upon learning that MDC never executed the Unit B JOA, Centennial promptly corrected the mistake by deducting past overpayments from future royalty payments from Unit A until the overpayments were repaid. (*See* D.I. 19-10 at A3260–61, ¶¶ 10–14); *see also* 3 Patrick H. Martin and Bruce M. Kramer, WILLIAMS & MEYERS, OIL AND GAS LAW § 657 (2020) (noting that when a royalty is paid based on good-faith mistake, payments may be recovered from payee not entitled to payments). Under these facts, the Bankruptcy Court properly held that Chenault-Vaughan's ratification claim failed as a matter of law. *Mem. Op.* at 30 n.91. Moreover, Chenault-Vaughan's argument that Centennial ratified the Lease by sending division orders to Chenault-Vaughan is unconvincing. Division orders have no legal weight; rather, they are helpful tools for accounting purposes. *See Prize Energy*, 345 S.W.3d at 560 (stating the division order is "the mechanism for payment to a payee of its share of oil and gas proceeds").

Even assuming Chenault-Vaughan's argument that Centennial's actions could be the basis for ratification, however, the Court agrees with Centennial that those actions were based on a mistake of fact, and that Centennial promptly corrected those actions once it learned that MDC did not sign the Unit B JOA. (D.I. 22 at 39) "[P]arties seeking to establish implied ratification or ratification by conduct must point to words or actions that *clearly evidence* an intention to ratify." *BPX Operating Co.*, 629 S.W.3d at 197–98 (emphasis added). Centennial's conduct of

promptly rectifying the royalty amount inadvertently paid to Chenault-Vaughan undermines any argument that payment evinced clear intent to ratify the Lease. *See id.* at 201 (finding the party did not clearly indicate an intent to ratify pooling even though she accepted payment of royalties based on pooling because there were other facts indicating her clear intent not to ratify). Chenault-Vaughan argues Centennial's mistake of fact defense to ratification was raised for the first time on appeal, thus Centennial has waived the defense. (D.I. 24 at 2) However, the record reflects that Centennial did raise mistake of fact as a defense in its briefing for its motion for summary judgment as well as an affirmative defense in its pleading. (*See* Adv. D.I. 55 at 15; Adv. D.I. 18 at 15, ¶ 2)

Chenault-Vaughan further argues for ratification because Centennial included the Lease in the Unit B Declaration and sent division orders *before* Centennial terminated the Unit B JOA with MDC or MDC abandoned the Lease. (D.I. 18 at 49–50) As such, Chenault-Vaughan argues this situation is unlike *Hunt Oil Co. v. Moore*, 656 S.W.2d 634 (Tex. App. 1983). The Court does not find this case relevant. In *Hunt Oil*, the lessee argued that a certain oil and gas lease was ratified by the lessor because the lessor executed division orders and cashed checks issued by the lessee. 656 S.W.2d at 639. The court found that the lease was not ratified because these actions occurred after the lease had terminated due to unauthorized pooling. *Id.* at 639–40. Here, there is no lease between Chenault-Vaughan and Centennial, as Centennial is the Operator not the lessee. Further, the Lease was included in the Declaration on account of Luxe's share. Therefore, this case is distinguishable.[9]

[9] Chenault-Vaughan also discusses *Superior Oil Co. v. Roberts*, 398 S.W.2d 276 (Tex. 1966) to support its proposition that Centennial ratified the Lease. (D.I. 18 at 50–51) However, the Court finds this case is unhelpful in that it does not substantively address ratification but only comments that the parties did not seek to ratify the lease at issue. *Roberts*, 398 S.W.2d at 277, 279.

### C. Self-Help Recoupment of Unit A Royalties

Chenault-Vaughan argues that the monetary judgment award in the amount of $137,276.73 should be reversed because Centennial's affirmative defense of recoupment fails both procedurally and as a matter of law. (*See* D.I. 18 at 9) Specifically, Chenault-Vaughan asserts that Centennial's recoupment defense is improper as Centennial should have pled set-off and should have brought it as a counterclaim. (*See id.*) Further, Chenault-Vaughan argues the recoupment defense it is barred by the voluntary payment doctrine. (*See id.*) The Court will address each argument below.

#### 1. Recoupment Defense was Properly Pled

Chenault-Vaughan argues that procedural deficiencies preclude Centennial's monetary judgment. Chenault-Vaughan claims Centennial improperly pled recoupment instead of setoff as an affirmative defense. (*Id.* at 12–15) Further, because Centennial did not bring a counterclaim, Chenault-Vaughan argues the monetary judgment award should be reversed. (*Id.* at 17–19)

"Recoupment . . . is a 'demand arising from the same transaction as the plaintiff's claim,' while an offset arises out of a transaction different than the one forming the basis of plaintiff's claim." *Garza v. Allied Fin. Co.*, 566 S.W.2d 57, 62–63 (Tex. App. 1978). While Chenault-Vaughan is correct in pointing out these two doctrines are distinct, it is incorrect in arguing that Centennial failed to properly plead its defense.

The Court finds Centennial did properly plead its affirmative defense. While Chenault-Vaughan argues Centennial should have pled setoff but instead pled recoupment, Centennial's Answer asserts offset: "A dispute as to title on Chenault-Vaughan's interest in the subject Unit B Iron Eagle wells caused Centennial to overpay royalties to Chenault-Vaughan on the Unit B wells. . . . Accordingly, Centennial is not liable to Chenault-Vaughan because Centennial is

entitled to *offset*." (Adv. D.I. 18 at 15, ¶ 2 (emphasis added)) The Court is not going to hold Centennial to such a highly specific pleading standard. *See* Fed. R. Civ. P. 8(b)(1)(A) (a responding party must "state in short and plain terms its defenses"). Centennial may have used both words "recoup" and "offset" interchangeably throughout its briefing, but the Court finds Centennial properly pled its affirmative defense.

The Bankruptcy Court determined that Centennial was entitled to recoup overpayments on Unit B from its subsequent payments on Unit A in the amount of $137,276.73. *See Mem. Op.* at 34–35. The Bankruptcy Court explained:

> Centennial proceeded, for some time, on the mistaken understanding that MDC *had* executed the operating agreement for Unit B. Centennial thus paid Chenault-Vaughan a royalty for that production. Upon discovering the mistake, Centennial essentially repaid itself for those overpayments by deducting the amounts it had paid Chenault-Vaughan on Unit B royalties from the amounts it otherwise owed for production on the MDC Unit A lease. As a general matter, Texas law, like the common law more generally, permits a party who owes a debt to setoff amounts owed to it against the amount it owes.

*Id.* (citing *Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28, 33 (5th Cir. 1963) (recognizing, under Texas law, that amounts previously overpaid operate as "a good defense" to amounts the payor otherwise owes the payee)). The Bankruptcy Court further noted the Supreme Court's explanation that the doctrine of recoupment is intended to avoid "the absurdity of making A pay B when B owes A." *Mem. Op.* at 35 (quoting *Studley v. Boylston Nat. Bank of Boston*, 229 U.S. 523, 528 (1913)); *see also Gulf Oil Corp.*, 322 F.2d at 33. Therefore, the Bankruptcy Court held that Centennial properly pleaded recoupment and offset as defenses to Chenault-Vaughan's claim for payment. *Mem. Op.* at 35.

Chenault-Vaughan argues that the Bankruptcy Court erred as a matter of law in finding that Centennial was permitted to engage in self-help methods to recoup Unit B royalties from

Unit A because Centennial was only permitted to recover on a counterclaim. (*See* D.I. 18 at 12–20)

The Court rejects Chenault-Vaughan's argument that Centennial was required to seek relief through a counterclaim. Chenault-Vaughan's argument is inconsistent with oil and gas practices and misunderstands the procedural posture of the case. As previously discussed, a recognized practice in oil and gas law allows operators to recoup overpaid royalties by deducting past overpayments from future royalty payments until the overpayments have been repaid. *See Gulf Oil Corp.*, 322 F.2d at 32–33 (applying Texas law and holding that overpayment to a payee for crude oil based on the mistake of fact could be offset against the amounts owed to the payee).

Second, Chenault-Vaughan's argument that Centennial is not eligible for counterclaim relief and the "*de facto* money judgment" in its favor misunderstands the procedural context of this case. (*See* D.I. 18 at 17–19) It would have made no sense for Centennial to file a counterclaim, whether for recoupment or offset. When Chenault-Vaughan filed suit against Centennial, Centennial had already made the overpayments and was recouping or offsetting the royalties. Thus, as it relates to the sued-upon royalties, Centennial had no cause of action to sue on—it could not sue for amounts it had already recovered. Consequently, Centennial asserted offset and recoupment defensively to negate Chenault-Vaughan's claim for payment. *See, e.g., Tamimi Global Co., Ltd v. Kellogg Brown & Root, L.L.C.*, 483 S.W.3d 678, 702 (Tex. App.–Houston [14th Dist.] 2015, no pet.) (quoting *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980)) ("Under Texas law, the 'right of offset is an affirmative defense.'").

Chenault-Vaughan relies on *Bright & Co. v. Holbein Family Mineral Tr.*, 995 S.W.2d 742 (Tex. App.–San Antonio 1999, pet. denied). (*See* D.I. 18 at 16–17) However, the case has no application here. The reason the court in *Bright & Co.* denied the lessee/operator Bright &

Co.'s setoff counterclaim is because it was barred by the statute of limitations and could not be saved under Civ. Prac. & Rem. § 16.069 because it was not filed within the requisite number of days. *See Bright & Co.*, 995 S.W.2d at 746–47. Here, there is no statute of limitations issue, so *Bright & Co.* is inapplicable to the present case.

Chenault-Vaughan further relies on *Gulf Oil Corp.* (*See* D.I. 18 at 17–18)  In that case, Gulf Oil and Lone Star contracted for the sale of oil. *Gulf Oil Corp.*, 322 F.2d at 28–29. For a period of time, Gulf Oil inadvertently failed to adjust its payment when the transportation cost changed and overpaid Lone Star in the amount of $44,522.33. *Id.* at 29. Gulf Oil deducted this amount from the next payment due to Lone Star, but Lone Star did not accept. *Id.* Lone Star then filed suit to recover this amount. *Id.* The district court found that Gulf Oil voluntarily paid the amount and was not allowed to recoup the overpayment because Gulf Oil did not meet its burden to show the overpayment was due to a mistake of fact. *Id.* at 32. The Fifth Circuit Court of Appeals disagreed. *Id.* at 32–33. The discussion regarding the counterclaim arises in the context of an alleged violation of the statute of limitations. *Id.* at 33. The Fifth Circuit found a counterclaim was not necessary because Gulf Oil's claim for overpayments was founded upon the written contract, therefore, the claim would not be barred by the statute of limitations. *Id.* Because there is no statute of limitations issue here, Chenault-Vaughan's reliance on *Gulf Oil Corp.* for support that Centennial was required to assert a counterclaim is therefore misplaced.

Chenault-Vaughan also argues that Centennial received a double recovery because MDC gave Centennial Unit A as an accord and satisfaction as part of a settlement in MDC's bankruptcy cases. (D.I. 18 at 16 n.6)  The Court will not entertain arguments placed in a footnote. *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are

considered waived.") Moreover, Chenault-Vaughan did not argue unjust enrichment or accord and satisfaction in its briefing before the Bankruptcy Court. (*See* Adv. D.I. 68; Adv. D.I. 71; Adv. D.I. 83) The Court will not address arguments that have not first been presented to the trial court. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007) ("[A]bsent exceptional circumstances, issues not raised before the district court are waived on appeal.").

**2. Voluntary Payment Doctrine is Inapplicable**

Chenault-Vaughan further argues that the voluntary payment doctrine prevented Centennial from recovering the alleged overpayments. (D.I. 18 at 20–28) "Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back . . . because the party at the time of payment was ignorant of or mistook the law as to his liability." *Samson Expl., LLC, v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 779 (Tex. 2017); *see also XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481, 499 (Tex. App. 2017) (finding the party was not allowed to recoup the overpayments because it voluntarily paid the royalties due to a mistake of law). As the Bankruptcy Court explained, the basis for this argument is the principle that a "voluntary payment" cannot be recovered on the ground that the payor operated on a misunderstanding of law. *See Mem. Op.* at 35 (citing *Samson Expl. LLC*, 521 S.W.3d at 779–80). The doctrine operates

> in essence, to provide that if a party pays a purported obligation despite knowing all of the facts that might give rise to a potential defense, it cannot thereafter seek to recover the amounts it paid based on the defense. The party's knowledge of the relevant facts at the time it made the payment renders the payment a "voluntary" one that cannot later be recovered.

*Mem Op*. at 35.

The Bankruptcy Court determined that the voluntary payment doctrine had no application to the facts of this case because Centennial paid the royalties based on a mistake of fact, not a mistake of law. *Id.* The Bankruptcy Court stated, "there [was] no dispute in this record that Centennial was unaware of the fact that MDC had not executed the Unit B joint operating agreement at the time it made the royalty payments to Chenault-Vaughan." *Id.* at 35–36. The Bankruptcy Court cited Skylar Fast's affidavit which stated that "[b]ased on the mistaken belief that MDC had executed the Unit B JOA, Centennial initially paid royalties owed under MDC's share of the Lease in Unit B to Chenault-Vaughan on MDC's behalf." (D.I. 19-10 at A3260, ¶ 11)

Chenault-Vaughan argues there was a factual dispute in the record, so it was improper for the Bankruptcy Court to award summary judgment on this issue. (D.I. 18 at 25–28) Specifically, Chenault-Vaughan claims that various pieces of evidence indicate Centennial was in fact aware of MDC's lack of signature of the Unit B JOA, which contradicts Centennial's evidence of Skylar Fast's affidavit. In support, Chenault-Vaughan cites the division orders sent by Centennial (D.I. 19-13 at A4109–19; A4136–37), a letter from Centennial to MDC acknowledging MDC's lack of signature of the Unit B JOA and rescinding it (D.I. 19-13 at A4134), and the Unit B JOA filed by Centennial with no MDC signature (D.I. 19-10 at A3161–87). (D.I. 18 at 22)

The Court finds no error in the Bankruptcy Court's determination that the voluntary payment doctrine did not apply. The Bankruptcy Court based its decision upon uncontradicted evidence in the record and Chenault-Vaughan's counsel's admission that no material factual disputes prevented summary judgment on this point. (Adv. D.I. 95 at 113:11–15 (Court: "[I]s any party saying we have a dispute of fact that isn't resolvable on the record in front of you and

you need a trial to resolve that factual dispute"? Chenault-Vaughan's counsel: "I don't think so.")) While Chenault-Vaughan argues the Bankruptcy Court ignored evidence in the record demonstrating a factual dispute, the evidence cited does not support Chenault-Vaughan assertions. The existence of the division orders, the letter rescinding the Unit B JOA offer, and the actual Unit B JOA demonstrates the fact that MDC did not sign the Unit B JOA, but it does not demonstrate Centennial's *knowledge or lack thereof* of this fact. Skylar Fast's affidavit, on the other hand, speaks to Centennial's knowledge and demonstrates Centennial's lack of awareness that MDC had not signed the Unit B JOA. Accordingly, the Court finds no error in the Bankruptcy Court's determination that a mistake of fact precluded application of the voluntary payment doctrine.

### D. <u>A Full Accounting of Unit A was Provided</u>

Chenault-Vaughan argues that the Bankruptcy Court erred when it found that Centennial had provided a full accounting in the context of TNRC § 91. (D.I. 18 at 9, 13–14) In its recitation of the facts, the Bankruptcy Court made the following findings based on the evidence before it:

> The total amount of those overpaid royalties, based on the unrebutted declaration of Skylar Fast, was $137,276.73. When Centennial discovered its error in February 2020, it began setting off its overpayment from the royalties it otherwise owed Chenault-Vaughan on the Unit A lease. Those overpayments were fully recouped in February 2021. Accordingly, in March 2021, Centennial resumed paying Chenault-Vaughan for royalties owed on Unit A.

*Mem. Op.* at 10–11 (citing D.I. 19-10 at A3258–61). The Bankruptcy Court, in a footnote, stated the full accounting—as opposed to Skylar Fast's recitation of the facts—was included in the evidence submitted by Centennial in support of summary judgment. *Mem. Op.* at 11 n.27. In the declaration, Skylar Fast also referenced and identified the accounting of the recoupment included

in the summary judgment record. (*See* D.I. 19-10 at A3260, ¶ 13 (referring to D.I. 19-10 at A3255–56))

Chenault-Vaughan argues that the accounting "document omitted the year March [of] 2020 through March [of] 2021 from its Unit A royalty disclosure and was likely not intended as a full accounting." (D.I. 18 at 9; *see* D.I. 19-10 at A3255)   Conversely, Centennial argues that the alleged missing information is contained within the document Chenault-Vaughan references. (D.I. 22 at 19)   According to Centennial, "Chenault-Vaughan appears to have overlooked the second page of the document." (*Id.* at 50–51; *see* D.I. 19-10 at A3256)   Chenault-Vaughan argues this evidence supports an accounting for the recoupment only, whereas Chenault-Vaughan requested an accounting for all of Unit A, as opposed to an accounting limited to recoupment.   (D.I. 24 at 24–26)   Indeed, the Skylar Fast Affidavit states the excel provided is a "summary of the accounting for the recoupment." (D.I. 19-10 at A3260, ¶ 13)   Chenault-Vaughan claims a year is missing.   (D.I. 24 at 26)

Having reviewed the record, however, the Court finds that the Bankruptcy Court did not err in finding that a full accounting for Unit A had been provided.   The year that Chenault-Vaughan claims to be missing is March of 2020 to March of 2021.   However, Centennial explains that during that period *all* of Unit A's revenue was applied to the overpayments they mistakenly paid on Unit B.   (*See* D.I. 19-10 at A3260, ¶¶ 11–13)   Centennial included a separate excel spreadsheet detailing this period of time with the revenue from Unit A that was applied. (D.I. 19-10 at A3256)   Therefore, the Court finds that no period is missing and will affirm the Bankruptcy Court's finding that a full accounting was provided.

**E. Judgment in favor of MDC**

Chenault-Vaughan argues that if the Court decides Centennial is liable for the pre-abandonment royalties, rather than MDC, then the judgment in favor of MDC should be reversed. (D.I. 18 at 69) But Chenault-Vaughan does not explain why this should happen. Centennial is also perplexed by Chenault-Vaughan's request to reverse judgment against MDC. (D.I. 22 at 56) Centennial argues that Chenault-Vaughan has represented that it does not seek to recover from MDC's bankruptcy estate, so the Bankruptcy Court properly denied Chenault-Vaughan's claims against MDC. (*Id.*)

As the Bankruptcy Court explained, the only way for Chenault-Vaughan to recover against MDC's bankruptcy estate was to file a proof of claim. (Adv. D.I. 120 at 5 ("[T]he exclusive means by which a creditor might recover on such a claim would be by the filing of a timely proof of claim.")) In the Bankruptcy Court proceedings, MDC argued Chenault-Vaughan's claims were time-barred. (*Id.* at 3) The Bankruptcy Court treated Chenault-Vaughan's complaint as an informal proof of claim and MDC's answer as an objection based on timeliness. (*Id.* at 3–4) The Bankruptcy Court then allowed briefing to determine whether Chenault-Vaughan's proof of claim should be allowed. (*Id.* at 4) In its briefing, Chenault-Vaughan made clear that it "did not and does not seek to share with creditors in [MDC's] bankruptcy estates." (*Id.*) Therefore, the Bankruptcy Court found "as a matter of law, Chenault-Vaughan is entitled to no other relief . . . against MDC" and entered judgment in favor of MDC. (*Id.* at 5)

The Court finds no support for Chenault-Vaughan's argument that judgment against MDC should be reversed. The Bankruptcy Court provided a thorough explanation and even

gave Chenault-Vaughan the opportunity to pursue a claim against MDC, despite its failure to file a timely proof of claim.  While Chenault-Vaughan may regret losing this opportunity, Chenault-Vaughan demonstrates no basis for reversal now.

## V.    CONCLUSION

For the reasons set forth above, the Court AFFIRMS the Bankruptcy Court's decision in its entirety.  (Adv. D.I. 97; Adv. D.I. 120)  An Order consistent with this Memorandum Opinion shall issue.

Dated: April 19, 2023

Sherry R. Fallon
United States Magistrate Judge